UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Charles R. Stone,

Plaintiff,

vs.

REPORT AND RECOMMENDATION

Rick Harry - COO; Anita Schlank - Clinical Director; Rhonda Heskin - Psychologist; Deborah Konieska - Behavioral Analyst; Amy Anderson - Behavioral Analyst; Lori Parkos - Security Guard,

Defendants.

Civ. No. 02-0028(MJD/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 15th day of July, 2002.

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendants' Motion to Dismiss. The Plaintiff appears pro se, and the Defendants appear by Kerri Stahlecker Hermann, Assistant Minnesota Attorney General.

For reasons which follow, we recommend that the Defendants' Motion to Dismiss be granted, and we further recommend that the Plaintiff's Motions for a Temporary Restraining Order, for a Tem-

(30)

FILED JUL 15 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

porary Injunction, and for a Preliminary Injunction, be denied as moot.

## II. Factual and Procedural History

The Plaintiff is currently a civilly committed patient in the Minnesota Sex Offender Program ("Program"), in Moose Lake, Minnesota. Each of the named Defendants is employed, by the State of Minnesota, in the Program. In his Complaint, the Plaintiff alleges that the Defendants have violated his rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, and have violated the protections of the Constitution of the State of Minnesota, as well as unspecified State and Federal laws. The Plaintiff's claims arise from a series of events that occurred between September of 2001, and December 5, 2001.

According to the Plaintiff, on September 5, 2001, after receiving information from an informant that the Plaintiff might have unauthorized access to the Internet from the computer in his room, the Program Staff conducted an investigative search of his room. During the course of the search, the Plaintiff's computer was confiscated. The Plaintiff contends that, as a result of the search, he was summoned to a disciplinary Hearing, where he was given five days of "level A punishment and a security rating decrease from 2B to 1A," because the search of his room had taken 7 man-hours and, under Program regulations, the Staff must be able to complete a

search in under 4 man-hours.[1] The Plaintiff was instructed to reduce the amount of personal property in his room, and he was informed that his room would be searched, again, in seven days in order to verify his compliance with the regulations.

On September 12, 2001, the Plaintiff's room was searched again. When they reached the four man-hour limit, Program Staff stopped their search, and confiscated all of the personal property which they had been unable to search during that period. The Plaintiff alleges that he was told that he had five days to have the confiscated items sent out of the Program, or they would be destroyed. The items were picked up by the Plaintiff's friends during visitation. According to the Plaintiff, on September 14, 2001, he was summoned to "an information Op Team Meeting," "for possible fraudulent misrepresentation." The Plaintiff received no punishment as a result of that meeting. On September 15, 2001, the Plaintiff's computer was returned to him.

The Plaintiff alleges that, on November 27, 2001, another investigative search was conducted of his room. According to the Plaintiff, this search was prompted by information given to the Program Staff by another Program resident, that the Plaintiff had

---

[1]The Plaintiff does not explain what a "level A punishment" is, nor the practical effects of having his security rating changed.

engaged in "possible fraudulent misrepresentation through the use of [his] computer and the unit telephone," and had child pornography in his room. The Plaintiff claims that, during the ensuing search, his computer was once again seized, as were his personal papers. Another search, based on information from another Program resident, that the Plaintiff had "critical contraband" in his room, was conducted on November 30, 2001.

On December 4, 2001, the Plaintiff was summoned to a disciplinary Hearing, where he was informed that "suspected contraband had been found on his computer and among his personal papers." The Plaintiff claims that he was not permitted to view the "contraband," and he alleges that, despite the fact that it was "never affirmatively determined that [he] had broken any institution[al] rule or policy which would give rise to sanctions," he was "punished for suspicion of misrepresenting himself to Modeling Agencies and people in the community." The Plaintiff also claims that he was not provided with any opportunity to prepare a defense, or to call witnesses prior to being placed on mail and telephone restrictions. Pursuant to the imposed restrictions, the Plaintiff was limited to receiving two incoming phone calls, and making two outgoing phone calls, each day. Those telephone calls were to last no longer than fifteen minutes each, and they would be audited by Program staff. In addition, the restrictive mail program required

that his outgoing mail be read, and actually be placed into the mails, by Program Staff.

The Plaintiff also alleges that, during the course of the meeting of December 4, 2001, the Defendant Deborah Konieska ("Konieska") informed him that the Program's administrators had asked the local Police Department to launch a criminal investigation into the Plaintiff's activities, and then Konieska "attempted to question [him] about matters concerning specifics of the incident." The Plaintiff contends that he told Konieska that he would not speak without the presence of legal counsel, but that she ignored this request. The Plaintiff alleges that two other disciplinary team members, the Defendants Amy Anderson and Lori Parksos, also worked "in concert," with other disciplinary team members, in trying to coerce him into providing incriminating information.

On December 5, 2001, the Plaintiff participated in a sex offender treatment group session which was facilitated by the Defendant Rhonda Heskin ("Heskin"). The Plaintiff alleges that Heskin attempted to "manipulate and coerce [him] into talking about the specifics of" the investigation into his activity, "in an attempt to garner information that would be useful to the local Police and possibly incriminating to the Plaintiff without the benefit of legal counsel present * * *." The Plaintiff contends that his

refusal to speak about the situation resulted in his being placed on "Treatment Probation."[2]

The Plaintiff claims that these attempts to coerce him into speaking subjected him to "verbally vicious and maligning accusations and ridicule from his peer group," and thus, interfered with his "statutory right to receive effective and[/]or adequate sex offender treatment to improve his mental and emotional health making further incarceration unnecessary." He asserts that the Defendants breached their professional duties, as treatment providers, by placing "themselves in the role of adversaries rather than healthcare providers," which affected his ability to participate meaningfully in treatment. The Plaintiff relates that he filed grievances concerning the allegations contained in his Complaint, and that all of his grievances were decided against him.

The Plaintiff also contends that the Defendants' searches of his room, and their seizure of his personal property, without a Warrant or probable cause, violated his State and Federal rights to be free from unreasonable searches and seizures. Further he maintains that the Defendants arbitrarily and capriciously violated his State and Federal Due Process rights by: 1) searching his room without a Warrant signed by a Judge; 2) denying him a Hearing in

[2]Once again, the Plaintiff fails to describe the consequences attendant to being placed on Treatment Probation.

front of an impartial fact finder; 3) denying him a Hearing by a Disciplinary Committee which was not comprised of persons providing him treatment; 4) denying the Plaintiff his liberty without just cause, or evidence to prove his guilt; 5) denying the Plaintiff a uniform policy and procedure for room searches; and 6) denying the Plaintiff adequate time to prepare a defense, and the opportunity to call witnesses in his defense. In addition, the Plaintiff claims that the Defendants violated State and Federal prohibitions against Double Jeopardy, by subjecting him to multiple punishments for the same rule infraction. Finally, it appears that the Plaintiff is also contending that the Defendants violated his Fifth Amendment rights by attempting to elicit incriminating information from him.

For relief, the Plaintiff asks this Court to issue a Temporary Restraining Order, enjoining the Defendants from: 1) attempting to "coerce" him into relating information about any criminal investigation of which the Plaintiff is a subject, without the benefit of legal counsel; 2) attempting to force him, as a part of his treatment program, to write down the specifics about issues which could give rise to criminal investigations; 3) retaliating against the Plaintiff for filing this action; and, 4) punishing the Plaintiff by restricting his use of telephones and the mails. Second, the Plaintiff asks that we enter a preliminary and permanent injunc-

tion: 1) prohibiting the Defendants, their successors, agents, and employees, and all other persons working in concert with them, from denying him due process rights in any disciplinary proceeding; 2) requiring the Defendants to submit disciplinary criteria that is equal to, or exceeds, the protections provided to incarcerated prisoners in disciplinary Hearings; and, 3) requires the Defendants to release him from any telephone or mail restrictions.

Third, the Plaintiff asks that we issue a Declaratory Judgment that the Defendants violated Federal and State law by denying him a Hearing before an impartial disciplinary committee, denying him time to prepare a defense, and denying him the opportunity to call witnesses. The Plaintiff also seeks Declaratory Judgments finding that the Defendants violated his Due Process rights during the course of the actions alleged in his Complaint, and that the guidelines utilized to reduce the Plaintiff's security level are vague, and unconstitutional. The Plaintiff asks us to direct the Defendants to expunge his record of the Disciplinary Committee's finding that he was "guilty," and to reverse and reinstate his security rating. Lastly, the Plaintiff seeks compensatory damages in the amount of $100,000.00 jointly, and severally, from the Defendants for their denial of his due process, $100,000.00 jointly, and severally, from the Defendants for lost wages, and $100,000.00 of punitive damages from each of the Defendants.

## III. Discussion

The Defendants have moved to dismiss the Plaintiff's Complaint in its entirety, as well as to deny the Plaintiff's Motions for injunctive relief. The Defendants claim that the Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction, under Rule 12(b)(1), Federal Rules of Civil Procedure, and pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. We take each argument in turn, starting with the Defendants' claim that this Court lacks the jurisdiction to entertain the Plaintiff's claims. The crux of the Defendants' subject matter jurisdiction defense is that the Eleventh Amendment of the United States Constitution provides them with sovereign immunity from suit. Thus, we start with a consideration of the relevant Eleventh Amendment jurisprudence.

### A. The Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.

The Defendants move for the dismissal of the Plaintiff's claim for retrospective monetary relief, based on actions that the Defendants took while acting in their official capacity, as well as seeking a dismissal of all of the Plaintiff's State-law claims. The Defendants argue that, under the Eleventh Amendment, they enjoy immunity from suit in Federal Court as to those claims, and that,

therefore, the Court lacks the subject matter jurisdiction to consider those claims.

1. Standard of Review. In Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, (1984), the Supreme Court considered the effect of the Eleventh Amendment on suits, which were brought by individual plaintiffs in Federal Court. Pennhurst related the long history of Eleventh Amendment jurisprudence, starting with the Supreme Court's holding in Hans v. Louisiana, 134 U.S. 1 (1890), that, "despite the limited terms of the Eleventh Amendment,[3] a federal court could not entertain a suit brought by a citizen against his own State." Pennhurst State School & Hospital, supra at 97. In Hans, the Supreme Court had recognized "the fundamental principle [that] sovereign immunity limits the grant of judicial authority in Art[icle] III" of the Constitution. In Ex Parte State of New York No. 1, 256 U.S. 490, 497 (1921), the Supreme Court further addressed the limitations placed on Federal Court jurisdiction by the "fundamental rule" of sovereign immunity as follows:

> That a State may not be sued without its consent is a fundamental rule of jurisprudence

---

[3]The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

> having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification.

The Supreme Court recognized, however, that a question might arise in certain cases, as to whether a suit was, in fact, a suit against a State, such as when a claim is only brought against State officials, and not against the State itself. See, Pennhurst State School & Hospital, supra at 100.

In considering when a suit that has been brought against State officials, rather than against the State itself, is still a suit against the State for Eleventh Amendment purposes, the Supreme Court started with the well-established principle that the "Eleventh Amendment bars a suit against state officials when 'the state is the real substantial party in interest.'" Id., at 101, citing Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945). As such "[t]he general rule is that relief sought nominally against the officer is in fact against the sovereign if the decree would operate against the latter," Hawaii v. Gordon, 373 U.S. 57, 58

(1963), and such a suit "is barred regardless of whether it seeks damages or injunctive relief." Pennhurst State School & Hospital, supra at 101, citing Cory v. White, 457 U.S. 85, 91 (1982).

However, in Ex parte Young, 209 U.S. 123 (1908), the Supreme Court recognized an important exception to that general rule, by holding that "a suit challenging the constitutionality of a state official's action is not one against the State." The Court explained that, when a State law is unconstitutional, that law is "void," and "does not 'impart to the officer any immunity from responsibility to the supreme authority of the United States.'" Pennhurst State School & Hospital, supra at 102, citing Ex parte Young, supra at 160. Thus, "[s]ince the state could not authorize his action, the officer was 'stripped of his official or representative character and [was] subjected to the consequences of his official conduct.'" Id. at 102, citing Ex parte Young, supra at 160. The exception is extremely narrow in its application, however, and, although the Ex parte Young exception permits an award enjoining future conduct by the State officials, the Eleventh Amendment still works to bar monetary relief for past governmental action. Id. 102-103, citing Edelman v. Jordan, 415 U.S. 651, 666-67 (1974).

In Pennhurst, the Supreme Court was first faced with the issue of whether a claim, that certain State officials had violated State

law, was a suit against the State, and therefore, barred by the Eleventh Amendment. The Court recognized that the rules permitting prospective relief, but barring a retrospective remedy, for the violation of Federal law by State officials, who were acting in their official capacity, were "the culmination of efforts by this Court to harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution." Id. at 105, citing Perez v. Ledesma, 401 U.S. 82, 106 (1971). However, the Court concluded as follows:

> This need to reconcile competing interests is wholly absent * * * when a plaintiff alleges that a state official has violated state law. In such a case the entire basis for the doctrine of Young and Edelman disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

Pennhurst State School & Hospital, supra at 106.

As a consequence, the Supreme Court held that the Ex parte Young, and Edelman, were inapplicable to suits brought by plaintiffs alleging that a State official violated State law, and that suits "against state officials for retroactive monetary relief, whether based on federal or state law, must be brought in state court."

Id. at 122. Likewise, it concluded that the Court lacked jurisdiction to enjoin State officials on the basis of State law, or to order that State officials comply with State law.

2. Legal Analysis. It is clear then, under the Supreme Court's holding in Pennhurst, that we lack the subject matter jurisdiction to consider the Plaintiff's claims for retroactive monetary damages for actions the Defendants took in their official capacities, regardless of whether those claims are based on State, or Federal law. The State has not waived its Eleventh Amendment immunity from suit and, as the Plaintiff's claims would "impose a liability which must be paid from public funds in the state treasury," his claims are barred by the Eleventh Amendment. Edelman v. Jordan, supra at 663. Therefore, we recommend that the portion of the Defendants' Motion, which seeks the dismissal of the Plaintiff's claims for money damages against the Defendants for actions they took in their official capacities be dismissed, regardless of whether the Plaintiff's claims are founded in State, or Federal, law.

The Defendants have not sought the dismissal of the Plaintiff's remaining Federal claims, on lack of subject matter jurisdiction grounds, and we plainly have subject matter jurisdiction to consider those claims. Thus, only the Plaintiff's Federal claims for injunctive, and declaratory relief, arising from the actions

taken by the Defendants in their individual or official capacities, and the Plaintiff's Federal claims for money damages, caused by the Defendants' acts in their individual capacities, survive the Defendants' Eleventh Amendment defense.

We turn, then, to the Plaintiff's remaining State law claims. Those State law claims, in which the Plaintiff seeks a Declaratory Judgment, or injunctive relief, for actions taken by the Defendants in their official capacities, are also barred, in Federal Court, by the Eleventh Amendment. As we have noted, in Pennhurst, the Supreme Court held that Federal Courts lack the jurisdiction to order State officials to comply with State law, because there could be no "greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." As a pure matter of jurisdiction, we cannot require a State official to comply with State law, or declare that a State official has violated a State law. See, Nicolaison v. Milczark, 26 Fed.Appx. 596, 597, 2002 WL 15669 (8th Cir. Jan. 8, 2002)(affirming District Court's holding that "the Court lacked authority to order defendants to comply with state law."). Therefore, we recommend that the Plaintiff's State law claims for injunctive, or declaratory relief, be dismissed, insofar as they relate to actions taken by the Defendants in their official capacities.

What remains for discussion are the Plaintiff's State law claims for actions, which the Defendants took, in their individual capacities, including his claims for damages, and injunctive and declaratory relief. As to those claims, the general rule is that "[t]he Eleventh Amendment does not bar federal court suits against a state officer in his individual capacity, regardless of the relief sought." Wasson v. Sonoma County Junior College, 4 F.Supp.2d 893, 901 (N.D. Cal. 1997), citing Scheuer v. Rhodes, 416 U.S. 232, 238 (1984). However, the Plaintiff's Complaint has been brought pursuant to Title 42 U.S.C. §1983, which provides relief only for the deprivation of Federal constitutional or statutory rights, and not for the violation of State laws. See, Myers v. Becker County, 833 F.Supp. 1424, 1430 (D. Minn. 1993); Nicholaison v. Milczark, supra at 597 (affirming the District Court's holding that the plaintiff could not seek relief, in Federal Court, under Section 1983 for alleged violations of Minnesota law.). Therefore, absent some other statement of jurisdiction, we lack the subject matter jurisdiction to entertain the Plaintiff's State law claims against the Defendants in their individual capacities.

In his More Formal Statement, at p. 2, the Plaintiff "also invokes the pendant jurisdiction of this court under 28 USC. [§]1343(3), and 28 USC [§] 1651." While the Plaintiff has not

invoked the correct statutory authority for pendant jurisdiction,[4] we will briefly address, in the interests of completeness, whether this Court has supplemental jurisdiction[5] to hear the Plaintiff's State law claims. See, Estelle v. Gamble, 429 U.S. 97, 106 (1976) (holding, in part, that, when considering a pro se litigant's pleadings, a Court must liberally construe its allegations). Under Title 28 U.S.C. §1367, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, under Title 28 U.S.C. §1367(c)(3), a Federal Court may decline to exercise such supple-

---

[4]Title 28 U.S.C. §1343(a)(3) provides that Federal District Courts have original jurisdiction to hear civil claims seeking "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." Thus, this provision provides for jurisdiction to consider claims seeking to hold State actors liable for the violation of Federal, not State, rights or laws. Further, Title 28 U.S.C. §1651 merely provides, that Courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions," and does not, in and of itself, provide the Courts with jurisdiction.

[5]In 1990, Title 28 U.S.C. §1367 was amended to substitute "supplemental" jurisdiction for "pendant" jurisdiction.

mental jurisdiction when the Court has "dismissed all claims over which it has original jurisdiction." Therefore, as we further find, in the following sections of this Report, that the Plaintiff has failed to state a claim upon which relief can be granted on his Federal claims, we recommend that the Plaintiff's remaining State claims be dismissed without prejudice. Since the Plaintiff would need to commence a State Court action so as to prosecute the other State law claims we have recommended to be dismissed, judicial efficiency would commend a denial of supplemental jurisdiction.

B. <u>The Defendants' Motion to Dismiss for Failure to State a Claim upon which Relief Can be Granted</u>.

As we read the Plaintiff's Complaint, the Plaintiff has four remaining Federal claims. First, the Plaintiff contends that his Fourth Amendment rights were violated when Program Staff searched his room, and seized his personal property. Second, he maintains that the Defendants violated his Fifth Amendment right to be free from Double Jeopardy, by giving him multiple punishments for the same violation. Third, the Plaintiff asserts that his Procedural Due Process rights were violated by the process denied him during the Hearing which lead to his punishment, and by the policies of the Program. Fourth, the Plaintiff argues that the Defendants violated his Fifth Amendment right against self-incrimination. As to each of these claims, the Defendants have responded

that they do not present a legally viable action. Therefore, the Defendants also seek the dismissal of those claims.

1. Standard of Review. In reviewing a Complaint under a Rule 12(b)(6) Motion, we must consider all of the facts alleged in the Complaint as true, and construe the pleadings in a light most favorable to the plaintiff. See, e.g., Brotherhood of Maintenance of Way Employees v. Burlington Northern Santa Fe Railroad, 270 F.3d 637, 6388 (8th Cir. 2001). In addition, in assessing a Rule 12(b)(6) Motion, the Court must liberally construe a pro se Complaint. Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). "A complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief." Young v. City of St. Charles, 244 F.3d 623, 627 (8th Cir. 2001), citing Breedlove v. Earthgrains Baking, 140 F.3d 797, 799 (8th Cir. 1998); Helleloid v. Independent School Dist. No. 361, 149 F. Supp.2d 863, 866-67 (D. Minn. 2001).

"Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." Young v. City of St. Charles, supra at 627, citing Neitzke v. Williams, 490 U.S. 319, 326-27 (1989). "To avoid dismissal, a complaint must allege facts suffi-

cient to state a claim as a matter of law and not merely legal conclusions." Id., citing Springdale Educ. Ass'n v. Springdale Sch. Dist., 133 F.3d 649, 651 (8th Cir. 1998).

2. Legal Analysis. Underlying each of the Plaintiff's remaining claims is the issue of how the Plaintiff's status, as a civilly committed sexual offender, impacts upon the Constitutional protections afforded to him. As a result, before we consider the Defendant's Motion to Dismiss as to those claims, we first address that issue.

The Plaintiff maintains that, under Minnesota's Commitment Laws, he "retains the same rights as if he lived in society," including his right to privacy. Plaintiff['s] Memorandum Opposing Defendants' Motion to Dismiss []his Complaint of Civil Right[s] Violations, ("Plaintiff's Opposition Brief") at 2. However, the Defendants urge that the Plaintiff's protections are limited by the very existence of his commitment and, alternatively, they cite cases involving pretrial detainees, and convicted prisoners.

In a recent case in this District, the appropriate level of protection, which is applicable to civilly committed individuals under the Fourteenth Amendment, was considered. See, Devillion v. Milczark, No. 01-617 (D. Minn. Dec. 21, 2001). In Devillion, the Court noted that pretrial detainees were not subject to the same type of disciplinary sanctions that were "an inherent aspect of a

prison sentence," because they had not been convicted of a crime, and found that reasoning "equally applicable to civilly committed detainees" who, "like pre-trial detainees, [we]re not serving prison sentences, and [we]re therefore not automatically subject to the normal punitive sanctions that inevitably accompany prison sentences." Id. at 9. However, the Court observed that it could not "find any good reason why civilly committed detainees should have broader due process rights than those guaranteed to pretrial detainees * * *." Id. By implication, our Court of Appeals has also applied the pretrial detainee standard to claims involving an asserted violation of Procedural Due Process rights. See, Nicolaison v. Milczark, supra at 597 (citing pretrial detainee case for the proposition that the defendant's actions were not violations of procedural due process).

We concur with the reasoning of Devillion, and note that the same reasoning was employed by our Court of Appeals when considering the appropriate constitutional standard to be applied to claims, by a civilly committed person, that his constitutional right to be free from the use of excessive force had been violated. See, Andrews v. Neer, 253 F.3d 1042, (8th Cir. 2001). In its analysis, the Court recognized that the appropriate constitutional standard varied depending on the plaintiff's status: for arrestees, "the Fourth Amendment's 'objective reasonableness' standard con-

trol[led];" for pretrial detainees, an objective reasonable standard also controlled, although it was "grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment;" and for prisoners, the appropriate standard was "provided by the Eighth Amendment's prohibition of cruel and unusual punishment." Id. at 1060-61.

The Court recognized, however, that the Eighth Amendment standard, which is applicable to convicted prisoners, would not be applicable to the claimant there, as he had been detained after being found not guilty by reason of insanity, "and thus he was not a 'prisoner' subject to punishment." Id. at 1061. The Court related that, although the claimant was not a prisoner, he was in the lawful custody of the State, and that his confinement "raised issues similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations." Id., citing Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989). Therefore, the Court concluded that the plaintiff's claims should be evaluated under the "standard usually applied to * * * claims brought by pretrial detainees." Id.

We find this reasoning persuasive, if not controlling. While the Plaintiff is not detained by reason of a criminal conviction,

he has been lawfully detained by the State of Minnesota. As such, he does not have the status of either a free citizen, or a convicted inmate. We concur in the view that his position is most analogous to that of a pretrial detainee, since his lawful detention raises concerns about institutional safety, order, and efficiency. None of the cases, which have been cited by the Plaintiff, stand for the proposition that he proposes; namely, that a civil detainee is entitled to the same protections as a free citizen. Rather, carefully reviewed, those cases stand for the proposition that some restrictions limit an institution's ability to impose regulations and policies which impact on the constitutionally protected rights of civilly committed persons. See, Youngberg v. Romeo, 457 U.S. 307 (1982)(holding that a civilly committed mental patient had liberty interests in safety, and freedom from bodily restraint, but that those interests were not absolute, and the determination of whether his rights had been violated required a balancing of his liberty interests against the State's asserted reasons for restraining his liberty); Jarvis v. Levine, 418 N.W.2d 139 (Minn. 1988)(holding that involuntary intrusive medical treatment of involuntarily committed mental patients required some additional process in order to protect the right of privacy guaranteed by Minnesota's Constitution); Price v. Sheppard, 239 N.W.2d 905 (Minn. 1976)(the administration of electroshock therapy to an in-

voluntarily committed minor patient was not an unconstitutional invasion of his right to privacy, but the consent of his legal guardian should be required in future cases).

Therefore, we conclude that the Plaintiff is entitled to no more protection than is extended to pretrial detainees, and we examine his constitutional claims in that light. In doing so, however, we do not necessarily conclude that the Plaintiff is due protection equal to that of the pretrial detainee, for we agree with the Court in, DeVillion v. Milczark, supra at 9 n.2, that, "[i]f anything, civilly committed detainees probably are entitled to less due process protection than pretrial detainees, because civilly committed detainees have already received the benefit of a complete court trial before being confined, whereas pretrial detainees have usually had -- at most -- only the benefit of a probable cause hearing." In our analysis, we merely conclude that, if the Plaintiff fails to state a claim upon which relief can be granted under the pretrial detainee standard, he would, a fortiori, fail to state a claim under any less protective standard which might reasonably be applied to a civilly committed sexual offender.

a. Plaintiff's Claim that the Defendants' Search of his Room, and Seizure of his Property Violated his Fourth Amendment Rights.

The Plaintiff alleges that his Fourth Amendment rights were violated when the Defendants searched his room, and

seized his property, without first obtaining a Search Warrant from a Judicial Officer, or without having probable cause to conduct the search. In response, the Defendants argue that the claim should be dismissed because the Plaintiff had no reasonable expectation of privacy in his room, or in his personal effects.

1) Standard of Review. The Fourth Amendment prohibits searches that are "unreasonable." U.S. Constitution, Amend. IV. A person claiming to have suffered from an unlawful search must first, as a threshold matter, establish that he had a legitimate expectation of privacy in the particular area searched. Rakas v. Illinois, 439 U.S. 128, 148-49 (1978). An expectation of privacy is legitimate only where "(1) the individual manifests a subjective expectation of privacy in the object of the challenged search; and (2) society is willing to recognize that subjective expectation as reasonable." United States v. Pinson, 24 F.3d 1056, 1058 (8th Cir. 1994), citing Katz v. United States, 389 U.S. 347, 361 (1967)(Harlan, J., concurring).

A legitimate expectation of privacy, however, merely establishes a plaintiff's standing to contest the search -- it does not render the search per se invalid for, as we have previously noted, the Fourth Amendment, by its very terms, only prohibits "unreasonable" searches. U.S. Constitution, Amend. IV; see also, Graham v. Connor, 490 U.S. 386, 395-97 (1989); O'Connor v. Ortega, 480 U.S.

709, 719-26 (1987)(plurality); Maryland v. Garrison, 480 U.S. 79, 86-88 (1987). Accordingly, a search is "reasonable" if the "[searching] officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, supra at 397; Maryland v. Garrison, supra at 87; Dawkins v. Graham, 50 F.3d 532, 534 (8th Cir. 1995).

2) Legal Analysis. The "extent of a pretrial detainee's [F]ourth [A]mendment rights * * * is not settled." United States v. Surridge, 687 F.2d 250, (8th Cir. 1982). In fact, the Supreme Court has stated that "[i]t may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore, the Fourth Amendment provides no protection for such a person." Bell v. Wolfish, 441 U.S. 520, 556 (1979). However, the Supreme Court has not, as of yet, accepted that argument, and thus, the Court presently assumes that a pretrial detainees retain a reasonable expectation of privacy "of a diminished scope." Id.

In Bell v. Wolfish, supra, the Supreme Court was faced with a class action suit, which had been brought by pretrial detainees, and which challenged the constitutionality of the conditions of their confinement, as well as the practices of the detention center. One of the plaintiffs' claims related to room-search prac-

tices. The plaintiffs complained that their Fourth Amendment right against unreasonable searches was violated by staff members who "conduct[ed] unannounced searches of inmate living areas at irregular intervals," while prohibiting the detainees from watching the searches. The Court felt it was "difficult to see how the detainee's interest in privacy [was] infringed by the room-search rule," as those searches were unquestionably "an appropriate security measure." Id. at 556.

The Court went on to observe that the detainee's drawers, beds, and personal items, could properly be searched, remarking that "even the most zealous advocate of prisoners' rights would not suggest that a warrant is required to conduct such a search." Id. The Court determined that, even denying the detainee permission to did not render the search unreasonable and, therefore, the Court upheld the room-search rule. See also, Block v. Rutherford, 468 U.S. 576, (1984)(upholding a jail's practice of conducting random, irregular "shakedown" searches of cells, in the absence of pretrial detainee occupants). Thus, the Court expressly held that no Warrant was required prior to a search of a pretrial detainee's room and, by upholding a rule which permitted random searches, the Court also concluded that no probable cause was needed before a such could ensue.

Accordingly, the Plaintiff's claim, that his Fourth Amendment rights were violated by the warrantless searches of his room, or by searches that were conducted without probable cause, must fail. If the searches were reasonable, they must be upheld. Indeed, the Plaintiff admits that the searches of his room on September 5, 2001, November 27, 2001, and November 30, 2001, were based on information that he might have had unauthorized Internet access, or other contraband, in his room, and that the search of his room on September 12, 2001, was based on the fact that a previous search of his room had been overly burdensome, in terms of man-hours expended, and was conducted for the purpose of determining the Plaintiff's compliance with the Program's rules concerning the quantity of personal property that he could store in his room.

Accordingly, we find the searches in question to be clearly reasonable, under the rule espoused in Bell, since they were reasonably related to the State's important efficiency, security, and treatment interests. The ability to access the Internet, and thus, to have access to pornography and to vulnerable individuals outside of the facility through electronic mail, fairly presents a security risk in the context of a sexual offender treatment facility. Access to such materials, and individuals, plainly poses an unreasonable risk of negatively impacting the treatment process, that underlies the Plaintiff's detention. Further, searches to deter-

mine the Plaintiff's compliance with rules concerning personal property are closely related to the Program's concerns for safety, order, and health.

Therefore, we conclude that the Plaintiff has failed to state a claim upon which relief can be granted as to Fourth Amendment claims, as the searches at issue were reasonable, and did not violate the Plaintiff's diminished expectation of privacy in his room. As a result, we recommend that the Fourth Amendment claims be dismissed as a matter of law.

b. The Plaintiff's Claim that he was Subjected to Double Jeopardy in Violation of the Fifth Amendment.

The Plaintiff complains that, "by giving [him] multiple punishments for the same alleged institutional rule violation," arising out of the "same set of facts," the Defendants violated his rights under the Double Jeopardy Clause of the Fifth Amendment, as applied to the States through the Fourteenth Amendment. See, Monge v. California, 524 U.S. 721, 727 (1998); United States v. One 1970 36.9' Columbia Sailing Boat, 91 F.3d 1053, 1055 (8th Cir. 1996). The Defendants move to dismiss this claim, and argue that, as a matter of law, the Plaintiff has failed to state a claim because the punishments he received were not criminal in nature. We agree, and recommend that the Plaintiff's claim for a violation of the Double Jeopardy Clause be dismissed.

1) Standard of Review. The Double Jeopardy Clause provides: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." Although generally understood to preclude being prosecuted twice for the same offense, the Supreme Court has also interpreted the statute as prohibiting States from "punishing twice, or attempting a second time to punish criminally, for the same offense." Witte v. United States, 515 U.S. 389, 396 (1995). The Double Jeopardy Clause "assures three basic protections -- it protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense." Turner v. Johnson, 46 F.Supp.2d 655, 666 (S.D. Tex. 1999), citing United States v. Usery, 518 U.S. 267 (1996); Witte v. United States, supra at 395-96. However, the Double Jeopardy Clause "protect[s] only against the imposition of multiple criminal punishments for the same offense," "and then only when such [criminal punishments] occur in successive proceedings." Hudson v. United States, 522 U.S. 93 98-99 (1997)[emphasis in original].

2) Legal Analysis. The Defendants argue that the civil commitment for sex offender treatment does not constitute punishment that, in and of itself, violates Double Jeopardy, and therefore, the restrictions imposed on the Plaintiff, during that

commitment, cannot constitute Double Jeopardy. However, we find this to be an improper focus for our inquiry. In considering the Plaintiff's claim, we must look to whether the Plaintiff received multiple punishments, for the violation of the same institutional rules, and if so, whether those punishments, in and of themselves, were "successive criminal punishments" meted out in successive "essentially criminal" proceedings.

Quite plainly, the Plaintiff's claims do not satisfy any of these requisites. First, it is clear that the Plaintiff was not punished multiple times for the same institutional rule violation. Second, the punishments that the Plaintiff received for his rule violations were not criminal. Finally, the process, through which the Plaintiff was punished, was not an "essentially criminal" proceeding.

The Plaintiff's Complaint alleges three different incidents for which he received punishment. The first was when, after a Disciplinary Hearing on September 5, 2001, the Plaintiff received five "days of level A punishment and a Security Rating decrease from 2B to 1A," because the search of his room had exceeded the permissible man-hours. The second was on December 4, 2001, when, for "suspicion of having contraband," and "suspicion of misrepresenting himself to Modeling Agencies and people in the community," the Plaintiff was placed on restrictive telephone and mail privi-

leges. The Plaintiff's third punishment involved his being placed on "Treatment Probation," as a result of his refusal to discuss the second punishment, in his group treatment session.

Clearly, none of the punishments were meted out for the same institutional rule violation. The first was for violating the Program's rules concerning the storage of personal property in one's room; the second was for violating the Program's rules about contraband, and contact with the public; and the third was for failing to participate in certain aspects of his treatment. Therefore, the Plaintiff fails to state a claim under the Double Jeopardy Clause.

Even if the Plaintiff's Complaint could be fairly read to allege multiple punishments for the same rule violation, his claim would still remain facially deficient, as the punishments were neither criminal, nor meted out in an essentially criminal proceeding. It is axiomatic that prison disciplinary proceedings are not criminal in nature, see, Wolff v. McDonnell, 418 U.S. 539, 556 (1974), and Rudd v. Sargent, 866 F.2d 260, 262 (8th Cir. 1989), and therefore, they do not implicate the Double Jeopardy Clause, which is only triggered by proceedings which are "essentially criminal" in nature. See, Breed v. Jones, 421 U.S. 519, 528 (1975). The reason for this rule is readily apparent: prison disciplinary proceedings concern the violation of institutional rules, and are "designed to maintain institutional security and order," and not to

punish criminally. Garrity v. Fielder, 41 F.3d 1150, 1152 (7th Cir. 1994); see also United States v. Newby, 11 F.3d 1143, 1144 (3rd Cir. 1993). This same reasoning applies with equal, if not greater, force to Disciplinary Hearings in sexual offender treatment facilities. The Plaintiff received punishment for violating institutional rules which were designed to maintain institutional security, safety, health, and order, and to facilitate the treatment purposes of the commitment -- they were not to punish the Plaintiff criminally. Therefore, any discipline that the Plaintiff received was not the result of a criminal proceeding, and the Double Jeopardy Clause is not implicated. Therefore, we agree with the Defendants that the Plaintiff has failed to state a claim that he was subjected to Double Jeopardy, and we recommend that this aspect of the Defendants' Motion also be granted.

c. The Plaintiff's Claim that his Procedural Due Process Rights were Violated by the Searches of his Room, and by the Disciplinary Hearings.

The Plaintiff contends that several of the Defendants' actions violated his Procedural Due Process rights. First, the Plaintiff claims that the Defendants' room searches violated his rights because they were not conducted pursuant to a Warrant, or to a uniform Program policy. Second, the Plaintiff claims that his Due Process rights were violated in the Disciplinary Hearings, through which he was punished, because he was denied

impartial fact finders, was punished by a panel of persons who also treated him, was denied liberty without just cause or evidence to prove his guilt, and was denied adequate time to prepare a defense or to call witnesses.

The Defendants respond that the Plaintiff's claims must be dismissed because he has failed to identify a particular liberty or property interest which would trigger the protections of the Due Process Clause. In the alternative, the Defendants argue that, even if the Plaintiff had identified a sufficient liberty or property interest, the imposed restrictions were de minimus, and would still did not trigger Due Process Clause protections, or they were not atypical or significant and, as such, did not affect a protected interest. Finally, the Defendants contend that, even if the Plaintiff did have a protected liberty or property interest, he has failed, nonetheless, to state a claim because the procedures used by the Disciplinary Committee did not violate his Procedural Due Process rights.

In determining whether a law violates procedural due process, the reviewing Court's first step is to determine whether there is a protectible liberty or property interest at stake. See, Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972). Only if that threshold question is answered in the affirmative, do we then inquire whether the procedures attendant to that deprivation

were constitutionally sufficient. Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 460 (1989). In his Complaint, the Plaintiff did not expressly identify any property or liberty interests. However, we fairly read the Plaintiff's Complaint to assert a liberty interest in being free from punishment imposed by the State, such that the Defendants could not punish him without affording him the procedural protections of Due Process, and a property interest in his personal possessions, such that the Defendants could not search, or seize, those possessions without first providing him with Due Process of law.[6]

---

[6]In the Plaintiff's Memorandum in Support of Complaint for Violation of Civil Rights Under 42 U.S.C. §1983, he, for the first time, expressly identified what he believed to be his protected liberty interest. However, this Memorandum was submitted in response to the Defendants' Reply Memorandum, and as such, is not a permitted submission. See, Local Rules 7.1. Although the Plaintiff claimed, in his Complaint, that his Due Process Rights had been violated by the Defendants, and that he had a protected liberty interest, the Plaintiff had not, prior to this unsolicited Memorandum of Law, expressly argued that Minnesota Statutes Section 253B.18, Subdivision 15, created a protectible liberty interest. Thus, the Defendants did not address this in their Reply. Nevertheless, even if the Plaintiff's Memorandum had been properly submitted, we would conclude that the Plaintiff's argument must fail as a matter of law.

The Plaintiff contends that a liberty interest was created by Minnesota Statute Section 253B.18, Subdivision 15, which governs discharge from commitment for those individuals who have been civilly committed as mentally ill and dangerous, including sexually dangerous persons. According to the Plaintiff, any punishment implicates the liberty interests created by the Statute, because that punishment might ultimately affect his ability to be discharged.
(continued...)

As we have previously explained, the Plaintiff is not entitled to Due Process rights greater, or broader, than those guaranteed to pretrial detainees. As such, in considering the Plaintiff's Procedural Due Process claims, arising from a liberty interest in freedom from punishment, we turn to the Supreme Court's decision in Bell v. Wolfish, supra at 535, where the Supreme Court held that pretrial detainees could not be "punished" without being afforded

---

(...continued)
However, in Sandin v. Connor, 515 U.S. 472 (1995), the United States Supreme Court considered a similar argument from a prisoner with an indeterminate sentence. The Court explained that "[t]he decision to release a prisoner rests on a myriad of considerations," and noted that "the prisoner is afforded procedural protection at his parole hearing in order to explain the circumstances behind his misconduct record." Id. at 487. Thus, the Court concluded that "[t]he chance that a finding of misconduct will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause." Id.

The same reasoning applies here, even though the Plaintiff is a civilly committed detainee, rather than a prisoner, like the plaintiff in Sandin. Minnesota Statutes Section 253B.18, Subdivision 15, sets forth a number of discharge criteria, and Subdivision 4c sets forth procedural protections which require that the Plaintiff's petition for release be reviewed by a special review board and the Commissioner of Human Services, and allows for an appeal to the Supreme Court Appeal Panel. The numerous criteria, which are considered in determining the Plaintiff's eligibility for release, and the considerable procedure that will be provided to the Plaintiff on such an application, draw us to conclude that the Minnesota Statute did not afford the Plaintiff a protected liberty interest that would entitle him to the procedural protections of the Due Process Clause any time he is punished. Therefore, even if the Plaintiff's claim to a protected liberty interest, by virtue of this Statute, had be properly raised in a properly submitted Memorandum of Law, it would, as a matter of law, fail.

the procedural protections of Due Process. In that opinion, however, the Supreme Court explained that not every sanction imposed against a pretrial detainee could be considered punishment that would give rise to Due Process concerns. Id. at 539, n. 21, ("There is, of course, a de minimus level of imposition with which the Constitution is not concerned."), quoting Ingraham v. Wright, 430 U.S. 651, 674 (1977). Therefore, "if a particular condition or restriction of a pretrial detainee is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" Smith v. Copeland, 87 F.3d 265, 267 (8th Cir. 1996).

Having considered the sanctions imposed upon the Plaintiff, as he has identified them in his Complaint, we cannot find that these "punishments" exceed the de minimus threshold. According to the Plaintiff, he has had his computer temporarily removed from his possession twice; he has had some personal property confiscated, and later ordered removed from the institution; he has received five days of "Level A punishment," and a reduced security rating; he has been subjected to telephone and mail restrictions, and he has been prescribed Treatment Probation.

While the Plaintiff was, undoubtedly, displeased by these additional restraints on his conduct, we are unable to find the restrictions sufficient to support a Due Process claim. Each of the restrictions was based upon a legitimate institutional concern,

such as security, health, safety and order, or was a valid treatment interest of the facility. Therefore, as those restrictions did not trigger the protections of the Due Process Clause, the Plaintiff had no right to either pre- or post-deprivation process and, even if true, the failure of the Defendants to provide the Plaintiff with a Hearing before a neutral board, which was not composed of his treatment providers, to afford him notice to allow for his preparation of a defense, and to call witnesses, did not constitute a violation of the Plaintiff's Constitutional rights.

As to the Plaintiff's claim of a property interest in his personal possessions, in Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir. 1984), our Court of Appeals reasoned that, in Bell v. Wolfish, supra at 554, "the Supreme Court stated that the 'due process rights of prisoners and pretrial detainees [against the deprivation of their property without due process of law] are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution.'" Here, some of the Plaintiff's property was removed from his room and, ultimately from the Program, due to the policy that it should take no more than four-man hours to search a room. In addition, the Plaintiff was deprived of the possession of his computer on two occasions, in order that Program Staff could search it for contraband.

The restriction on the amount of personal property, that a Program participant can store in his or her room, allows Program Staff to conduct room searches within a reasonable amount of time. We cannot say that such a restriction is clearly unreasonable, as a restriction on the amount time that Program Staff should have to spend in searching one participant's room, in light of the number of participants, as well as the other duties of Program Staff, is a legitimate institutional interest. Further, even if we were to believe that the limitation was unreasonable -- which we do not -- "substitution of judicial judgment for that of the expert prison administrators in matters such as this is inappropriate." Bell v. Wolfish, supra at 554. Therefore, we conclude that the compelled reduction in the amount of personal possessions that the Plaintiff could keep in his room, does not rise to the level of a constitutional concern, as the reduction serves a proper institutional purpose. See, e.g., Lyon v. Farrier, supra at 527 (restrictions on amount of personal goods in cell serves institutional interest of preventing fire hazards); Losee v. Nix, 842 F. Supp. 1178, 1183 (S.D. Ia. 1994)(limitation on amount of personal property in cell furthers institutional interests in security and tranquility); Murphy v. Dowd, 757 F. Supp. 1019, 1021 (E.D. Mo. 1990)(limit on personal items in cell advances institutional interests in preventing fires and the collection of contraband which would elude

all but exhaustive searches). In addition, we find it noteworthy that the Plaintiff was allowed to reduce the amount of property in in his room, but failed to avail himself of that opportunity.

The temporary removal of his computer, in order to allow the Program Staff to search it for contraband, or for other evidence that the Plaintiff had violated the institution's rules concerning Internet access, was also a reasonable restriction, based upon institutional concerns. The Plaintiff has not advanced any affirmative showing that he had a Constitutionally protected right to possess a computer, such that a temporary seizure of the computer so as to assure that it was not being used for non-therapeutic, or otherwise inappropriate purposes, would constitute a Due Process violation. We cannot say that the temporary removal of his computer was anything other than a "reasonable limitation or retraction in light of the legitimate security concerns of the institution." Bell v. Wolfish, supra at 554.

Finally, as to any contraband, which was removed from his room during the searches, because he is forbidden from possessing such materials, he "cannot seriously argue that he had a protected property interest in it." Lyon v. Farrier, supra at 527. Therefore, as the Plaintiff had no protectible property or liberty interests that were implicated by any of the Defendants' actions, we agree with the Defendants that he has failed to state a claim upon which

relief can be granted on Procedural Due Process grounds and, therefore, we recommend that this portion of the Defendants' Motion to Dismiss be granted.[7]

---

[7]Even if the Plaintiff had established a constitutionally protected liberty or property interest, he has not shown that the procedures employed by the Defendants, denied him Procedural Due Process. Under the rule set forth in Matthews v. Eldridge, 424 U.S. 319 1976), Courts are to consider the specific interest which the plaintiff asserts is being infringed, and then consider the likelihood that the procedures provided would result in an erroneous deprivation of that interest, whether additional procedures would have reduced that likelihood, and also consider the State's interest in providing the procedures that it has. Even if the Plaintiff did have a protected liberty interest, the requirements that the Plaintiff contends are necessary, in order to protect him from an erroneous deprivation, would not render the decisionmaking process more accurate.

The Plaintiff asserts that he should have had the right to an impartial decisionmaker, should have been provided the opportunity to prepare a defense, and should have been permitted to call witnesses in his defense. However, the availability of the grievance procedure, which the Plaintiff admits to having fully utilized, provided him with ample process. If those who made the determination at the Hearing were, in fact, biased, or if there was insufficient evidence to support their finding, that the Plaintiff had violated an institutional rule, the Plaintiff would have ample opportunity to raise that complaint in a grievance. Further, the Program had a substantial interest in adhering to the procedures that it has provided. Given the treatment purposes which underlie the Program's existence, Program Staff must be able to enforce procedures and policies, which advance those purposes, without delay. If the Program were forced to find persons, outside of its staff, to conduct a Hearing, or to allow the Plaintiff all the rights akin to a Federal criminal Trial, prior to confiscating contraband, searching a room, or imposing mail and telephone restrictions, then the Program participant would be able to engage in behavior which is not only detrimental to his own treatment, but also to that of other Program participants, and could create a danger to the community. Therefore, even if the Plaintiff could assert a protected

(continued...)

d. <u>The Plaintiff's Claim that His Fifth Amendment Rights Were Violated</u>.

The Plaintiff's final claim is that the Defendants violated his Fifth Amendment right against self-incrimination, when they attempted to obtain information from him about "an alleged crime," which was under investigation by the local Police Department. The Plaintiff contends that he was placed on Treatment Probation as a result of asserting his Fifth Amendment right to remain silent, and that therefore, he was denied his statutory right to receive treatment, which might have the result of extending the length of his commitment. The Defendants assert, once again, that the Plaintiff has failed to state a claim upon which relief can be granted because the Defendants' actions did not compel him to speak, despite a desire to remain silent, and because the Plaintiff was not punished for his invocation of his Fifth Amendment rights, but rather, was punished for his failure to participate fully in his treatment.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." The Supreme Court has long held that the

(...continued)
liberty or property interest, which had been implicated by the Defendants' actions, we would be compelled to conclude that the Program's procedures sufficiently protected his Due Process rights.

privilege against self-incrimination "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" Minnesota v. Murphy, 465 U.S. 420, 426, (1984), quoting Lefkowitz v. Turley, 414 U.S. 70, 77,(1973); see also McCarthy v. Arndstein, 266 U.S. 34, 40, (1924). As the Supreme Court has recently reiterated, this "constitutional guarantee is only that the witness not be compelled to give self-incriminating testimony." McKune v. Lile, 536 U.S. ---, 122 S.Ct. 2017, 2026 (2002), quoting United States v. Washington, 431 U.S. 181 (1977).

In interpreting this guarantee, the Supreme Court has stated that a State may not impose substantial penalties upon a person who elects to exercise his Fifth Amendment rights. See, Minnesota v. Murphy, 465 U.S. 420, 434 (1984). However, in making the determination of whether a penalty imposed is substantial, "the fact of a valid conviction and the ensuing restrictions on liberty are essential to the Fifth Amendment analysis," as consequences which "might infringe constitutional rights in free society [might] fall within the expected conditions of confinement of those who have suffered a lawful conviction." McKune v. Lile, supra at 2026, citing Sandin

v. Connor, supra at 485. Thus, for instance, while the Fifth Amendment prevents prosecutors from commenting on a defendant's option to remain silent during Trial, during prison disciplinary proceedings, a prisoner's silence can be commented on, even though it might cause the prisoner to feel compelled to speak, because of the "prison setting and the State's interests in rehabilitation and orderly administration." Id. at 2027, citing Baxter v. Palmigiano, 425 U.S. 308 (1976).

Since it is only compelled testimony that is prohibited by the Fifth Amendment, and because not every consequence of invoking the right to remain silent is substantial enough to be thought to compel testimony, not every consequence of invoking the right amounts to compulsion. Instead, "[t]he touchstone of the Fifth Amendment is compulsion," and only those consequences which may be "capable of forcing the self-incrimination," are forbidden by that Amendment. See, Lefkowitz v. Cunningham, 431 U.S. 801, 806 (1977). Here, the Plaintiff claims that the Defendants attempted to obtain information from him concerning "an alleged crime" which was then under investigation by the local Police Department, and that, when he refused to speak, he was placed on Treatment Probation. The Plaintiff maintains that this is the type of unfavorable consequence that is capable of forcing self incrimination, as it denies

him access to treatment, which might, in turn, result in lengthening the duration of his commitment.

We cannot agree, for three analogous cases counsel a different conclusion than that urged by the Plaintiff. Most recently, in McKune v. Lile, supra, the United States Supreme Court considered the claim of a State prisoner who alleged that the prison's Sexual Abuse Treatment Program ("SATP"), and related regulations and policies, violated his Fifth Amendment rights. The SATP required participants to disclose their present and past sexual behavior, even if would constitute a criminal offense, and such information was not protected, by use immunity, from prosecutors. Failure to make those disclosures would result in the loss of prison privileges, such as an automatic curtailment of his visitation rights, earnings, work opportunities, ability to send money to family members, canteen expenditures, to personal television, and other privileges, and would result in the prisoner's transfer to a potentially more dangerous maximum-security unit. Notwithstanding these consequences, the Court concluded that they were not so severe as to amount to compelled self incrimination.

In McMorrow v. Little, 109 F.3d 432 (8th Cir. 1997), a State prisoner commenced a Section 1983 action against prison officials, who withheld parole, work release, and less restricted confinement from him, because he refused to admit that he committed the sexual

offender crime for which he was convicted. While the prisoner would not be exposed to any unconstitutional self incrimination, as to a crime of which he had already been convicted, the prisoner noted that he had testified at his Trial that he did not commit the offense and, therefore, if he admitted the offense after his conviction, he could be exposed to a perjury charge.

Although the Court dismissed the prisoner's action on qualified immunity grounds, the Court went on to reason, as follows:

> [The prisoner's] complaint states that the officials denied him certain benefits because he refused to admit his guilt, not because he invoked his privilege against self-incrimination. Under [Minnesota v.] Murphy[, 465 U.S. 420 (1984)], prison officials may constitutionally deny benefits to a prisoner who, by invoking his privilege against self-incrimination, refuses to make statements necessary for his rehabilitation, as long as their denial is based on the prisoner's refusal to participate in his rehabilitation and not his invocation of his privilege.

McMorrow v. Little, supra at 436, citing Asherman v. Meachum, 957 F.2d 978, 980-83 (2nd Cir. 1992)(en banc).

Subsequently, in Doe v. Sauer, 186 F.3d 903, 906 (8th Cir. 1999), the Court relied upon McMorrow, in holding that a State Board of Parole had not violated a prisoner's privilege against self incrimination when it denied him parole when he refused to participate in a sexual offender treatment program because he would have to "admit guilt not only for the offense of conviction, but also for other

acts of sexual abuse without any grant of immunity from the prosecution for such admissions." Id. at 905.

In dismissing the prisoner's Fifth Amendment claim, the Court cited the language we quoted above from McMorrow, and went on to reason:

> Thus the denial of parole is permissible if it is based on the prisoner's refusal to participate in his rehabilitation and not based on his invocation of his privilege. * * * [The prisoner] has refused to admit he committed the offense for which he was convicted, and as observed by the Second Circuit, "[a]n inmate who is unwilling to admit to particular criminal activity is unlikely to benefit from a rehabilitative process aimed at helping those guilty of that activity." Johnson v. Baker, 108 F.3d 10, 12 (2nd Cir. 1997)(holding a policy requiring an inmate to admit to sexual offenses before admission to sex offender treatment program did not violate the inmate's right against self-incrimination). Therefore, even if the parole board denied parole to [the prisoner] because he refused to participate in the SOTP [i.e., Sexual Offender Treatment Program], the denial was based on [the prisoner's] refusal to participate in his rehabilitation and was not based on [the prisoner's] invocation of his privilege against self-incrimination."

Id. at 906.

These cases recognize the importance of rehabilitation for sexual offenders, as well as the State's legitimate interest in the implementation of treatment programs, such as that relating to the Plaintiff. As the Supreme Court explained, in McKune:

> Acceptance of responsibility is the beginning of rehabilitation. And a recognition that there are rewards for those who attempt to reform is a vital and necessary step toward completion. The Court of Appeals' ruling [which upheld the prisoner's self incrimination claim] would defeat these objectives. If the State sought to comply with the ruling by allowing respondent to enter the program while still insisting on his innocence, there would be little incentive for other SATP participants to confess and accept counseling; indeed, there is support for Kansas' view that the dynamics of the group therapy would be impaired. If the State had to offer immunity, the practical effect would be that serial offenders who are incarcerated for but one violation would be given a windfall for past bad conduct, a result potentially destructive of any public or state support for the program and quite at odds with the dominant goal of acceptance of responsibility. If the State found it was forced to graduate prisoners from its rehabilitation program without knowing what other offenses they may have committed, the integrity of its program would be very much in doubt. If the State found it had to comply by allowing respondent the same perquisites as those who accept counseling, the result would be a dramatic illustration that obduracy has the same rewards as acceptance, and so the program itself would become self-defeating, even hypocritical, in the eyes of those whom its seeks to help. The Fifth Amendment does not require the State to suffer the programmatic disruptions when it seeks to rehabilitate those who are incarcerated for valid, final convictions.

McKune v. Lile, supra at 2032.

The same may be said here.

We recognize that the Plaintiff, here, is not a prisoner, but is one who is civilly committed and, to that extent, his circum-

stances differ from those in McKune, McMorrow, and Doe, but the types of treatment, including an "acceptance of responsibility" are analogous, if not the same, and the restrictions on the Plaintiff's freedoms are closely corresponding. Accordingly, we find these cases enlighten our analysis of the Plaintiff's constitutional claims. Here, unlike in McKune, McMorrow, and Doe, the Plaintiff does not allege any institutional consequences of his invocation of his right to silence, other than to unspecifically assert that he was placed on "Treatment Probation," and has been subjected to "vicious and maligning accusations and ridicule from his peer group." See, Plaintiff's Complaint, at p. 8, paragraphs 21 and 24. Indeed, the Plaintiff does not so much as allege that any discipline, that was meted out on December 4, 2001, was imposed as a punishment for his refusal to talk about his past sexual behavior. Consistent with McKune, McMorrow, and Doe, we are satisfied that if any substantive consequence followed his refusal to comment about his past sexual acts, the Plaintiff would have pled those consequences in his Complaint.[8] Therefore, finding that the ad-

[8]The Plaintiff does allege an entitlement to "receive effective and[/]or adequate sex offender treatment to improve his mental and emotional health making further incarceration unnecessary." Plaintiff's Complaint, at p. 8, paragraph 24. We are ill-disposed, however, to second-guess the rehabilitative approaches the State follows in treating perpetrators of sex offenses. As the Court observed, in McKune v. Lile, 536 U.S. ---, 122 S.Ct. 2017, 2026 (continued...)

verse consequences, which the Plaintiff has pled in his Complaint as having arisen from his refusal to admit past sexual acts in the context of the Defendant's treatment program, are not so severe as

---

[8](...continued)
(2002), "[t]he Court has instructed that rehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty," and, "[s]ince most offenders will eventually return to society, [a] paramount objective of the correction system is the rehabilitation of those committed to its custody." [Citations omitted]. "Acceptance of responsibility in turn demonstrates that an offender "is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary." Id., quoting Brady v. United States, 397 U.S. 742, 753 (1970).

Even if construed as suggesting that his length of incarceration might be more extensive if he does not submit to rehabilitation, this is not the type of "compulsion" to which the Fifth Amendment was aimed. As the Court observed, in McKune, "[d]etermining what constitutes unconstitutional compulsion involves a question of judgment: Courts must decide whether the consequences of an inmate's choice to remain silent are closer to the physical torture against which the Constitution clearly protects or the de minimus harms against which it does not." Id. at 2028-29. The Plaintiff's "choice is marked less by compulsion than by choices the Court has held give no rise to a self-incrimination claim." Id. at 2029; see also, Baxter v. Palmigiano, 425 U.S. 308 (1980) (silence of accused during State prison disciplinary Hearing can be held can be basis for adverse inference); Ohio Adult Parole Authority v. Woodward, 523 U.S. 272 (1998)(death row inmate could be made to choose between incriminating himself at his clemency interview and having adverse inferences drawn from his silence); Minnesota v. Murphy, 465 U.S. 420 (1984)(Court found no Fifth Amendment violation when parolee chose to admit violation, rather than face potential return to prison for 16 months if he remained silent). In short, the Plaintiff was faced with the choice of assisting with his rehabilitation, or not, and while that choice may have been difficult for him to make, it was not unconstitutional.

to constitute a compelled self incrimination, we recommend that the Plaintiff's Fifth Amendment claim also be dismissed.

NOW THEREFORE, It is --

RECOMMENDED:

1. That the Defendant's Motion to Dismiss [Docket No. 16] be Granted.

2. That the Plaintiff's Motion for Immediate Temporary Restraining Order [Docket No. 4] be Denied as Moot.

3. That the Plaintiff's Motion for Temporary Injunction [Docket No. 5] be Denied as Moot.

4. That the Plaintiff's Motion for Preliminary Injunction [Docket No. 6] be Denied as Moot.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 1, 2002,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.

Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 1, 2002,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.